# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4667 | **DATE** | 9/28/2004 |
| **CASE TITLE** | Wolff vs. Continental Casualty Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

| | | |
|---|---|---|
| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due_____. Reply to answer brief due_____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry]  Enter Memorandum Opinion and Order.  For the reasons stated in the Memorandum Opinion and Order, plaintiff's motion [10-1] for summary judgment and defendant's motion [8-1] for summary judgment are both denied.  Status hearing is set for 10/19/04 at 9:30 a.m. |
| (11) | ■ | [For further detail see order attached to the original minute order.] |

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 3 0 2004 | 23 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | GMA | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 9/28/2004 | |
| | | | date mailed notice | |
| MD | courtroom deputy's initials | | MD | |
| | | | mailing deputy initials | |

U.S. DISTRICT COURT

2004 SEP 29 AM 10:29

Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| JEFFREY WOLFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 C 4667 |
| | ) | Judge Joan H. Lefkow |
| CONTINENTAL CASUALTY COMPANY, | ) | |
| a CNA Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DOCKETED

SEP 3 0 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jeffrey Wolff ("Wolff"), filed this suit against defendant, Continental Casualty

Company, a CNA Company ("Continental"), under the Employee Retirement Income Security

Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking payment of short- and long-term disability

benefits. Before the court are cross-motions for summary judgment. For the reasons stated

below, both motions are denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The

party seeking summary judgment bears the initial burden of proving there is no genuine issue of

material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving

23

party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella* v. *Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## FACTS[1]

Wolff was employed by Societe Generale as a securitization investment banker/vice president from April 29, 1997 through December 13, 2002. (Pl. L.R. 56.1 ¶ 6.) Societe Generale provided its employees, including Wolff, with short- and long-term disability income insurance coverage through insurance policies (the "plans") underwritten and insured by Continental. (*Id.* ¶ 7.) The short-term plan (No. SR-83123457) provides benefits for an insured participant for up to six months when the participant becomes "disabled." The short-term plan defines "disability" or "disabled" as follows:

> Occupational Qualifier: "Disability" means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are: (1) continuously unable to

---

[1]The facts as set forth herein, taken from the parties' statements of material facts and supporting materials, are undisputed unless otherwise indicated.

perform the Material and Substantial Duties of Your Regular Occupation; and (2) not working for wages in any occupation for which You are or become qualified by education, training, or experience.

Earnings Qualifier: You may be considered Disabled during and after the Elimination Period in any weekly period which You are Gainfully Employed, if an Injury or Sickness is causing physical or mental impairment to such a degree of severity that You are unable to earn more than 80% of Your Weekly Earnings in any occupation for which You are qualified by education, training, or experience.

(*Id.* ¶ 11.)  The long-term plan (No. SR-83123458) provides benefits to a participant in the event

the insured suffers a disability lasting beyond the six month short-term disability period.  The

long-term plan defines "disability" or "disabled" as follows:

Occupation Qualifier: "Disability" means that during the Elimination Period[2] and the following 24 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are: (1) continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and (2) not working for wages in any occupation for which You are or become qualified by education, training, or experience.

After the Monthly Benefit has been payable for 24 months, "Disability" means that Injury or Sickness causes physical or mental impairment to such a degree of severity that you are: (1) continuously unable to engage in any occupation for which You are or become qualified by education, training, or experience; and (2) not working for wages in any occupation for which You are or become qualified by education, training, or experience.

Earnings Qualifier: You may be considered Disabled during and after the Elimination Period in any Month in which You are Gainfully Employed, if an Injury or Sickness is causing physical or mental impairment to such a degree of severity that You are unable to earn more than 80% of Your Monthly Earnings in any occupation for which You are qualified by education, training, or experience.  On each anniversary of your Disability, We will increase the Monthly Earnings by the lesser of the current annual percentage increase in CPI-W, or 10%.

(*Id.* ¶ 13.)

To file a claim under either plan, a participant must provide, among other things, the

---

[2]The long-term plan defines the "Elimination Period" as a 180-day waiting period between the onset of disability and the date benefits start.  A participant must by "continuously Disabled" through the Elimination Period. (Def. Ex. A, at 012.)

following:

> 5.   Objective medical findings which support Your Disability.
>       Objective medical findings include but are not limited to tests, procedures, or
>       clinical examinations standardly accepted in the practice of medicine for Your
>       disabling condition(s).
> 6.   The extent of Your Disability, including restrictions and limitations preventing
>       You from performing Your Regular Occupation.

(Def. L.R. 56.1 ¶ 6.)

The Summary Plan Descriptions ("SPD") associated with each of the plans provide that

with respect to making benefit determinations, "The Administrator and other Plan fiduciaries

have discretionary authority to interpret the terms of the Plan and to determine Your eligibility

for and entitlement to benefits in accordance with the Plan. With respect to making benefit

decisions, the Plan Administrator has delegated sole discretionary authority to Continental

Casualty Company to determine Your eligibility for and entitlement to benefits under the Plan

and to interpret the terms and provisions of any insurance policy issued in connection with the

Plan." (*Id.* ¶ 8.) Each SPD also states that it "does not constitute a part of the Plan, nor any

insurance policy issued in connection with it." (Admin. R., at 023, 046.)

The Certificate of Insurance associated with the long-term policy indicates that when

Continental makes a benefit determination under the long-term plan, it has "discretionary

authority to determine Your eligibility for benefits and to interpret the terms and provisions of

the policy." It also states, "This certificate, however, is not the policy. It is merely evidence of

insurance provided under the policy." (*Id.* at 010.) The Certificate of Insurance associated with

the short-term plan contains no language regarding Continental's discretionary authority. (*Id.* at

036.)

4

On or about December 13, 2002, Wolff ceased working at Societe Generale. On December 16, 2002, Wolff filed three separate claims for disability benefits under the short-term plan. The first claim identified Wolff's disability as "L5-S1 right herniation, degenerative disc, C5-C6 herniation and degeneration, pain in legs, feet, neck, arms, hands." (Admin. R., at 052.) The claim was supported by a physician's statement from Dr. Daniel Hurley diagnosing Wolff with "degenerative disc disease, disc bulge C5-6" and stating objective findings of "degenerative disc disease cervical spine C5-6 foraminal stenosis, myositis, L5-S1 herniated disc." (*Id.* at 053.) The second claim identified Wolff's disability as "anxiety and depression caused by chronic pain, work stress and trouble eating/swallowing/breathing." (*Id.* at 054.) This claim was supported by a physician's statement from Dr. Michael McNulty diagnosing Wolff with "anxiety d/o due to a general medical condition with panic attacks." (*Id.* at 055.) The third claim identified Wolff's disability as "dysphasia, laryngitis, acid reflux begun July 2002 from work stress, voice strain, large food piece swall [*illegible*] . . . ." (*Id.* at 056.) This claim was supported by a physician's statement from Dr. Daniel Danahey diagnosing Wolff with "reflux laryngitis" and stating objective findings of "interarytenoid edema & post [*illegible*] edema." (*Id.* at 057.)

Wolff's claim file also included a letter to Societe Generale from Dr. Charles Wang dated September 12, 2002. Dr. Wang, who had treated Wolff in July 2002, stated

> With the onset of neck and arm pain, an MR scan of the cervical spine was recommended. The scan revealed some osteophytes and some disc bulging into the neural foramen between C5-C6 and some mild disc bulging at C6-C7. Jeff also had an EMG of the bilateral upper extremities which was essentially unremarkable. His previous lumbar pain was taken care of by Dr. Fessler and Dr. Hurley. He has had steroid injections in the lumbar area by Dr. Hurley. At this time, I will refer him to Dr. Hurley for possible epidural steroid injections for his neck pain. Jeff's neck pain has been treated conservatively with medications, including Neurontin and Celebrex. The patient experienced decreased pain on his medication but reported possible side effects including

difficulty with balance, drowsiness and dizziness. Although his pain has improved as of this date, Jeff reports he continues to experience leg pain, numbness and stiffness; neck-related shoulder, mild arm and hand pain with tingling.

(Def. L.R. 56.1 ¶ 11.)

On December 27, 2002, Continental informed Wolff that it had received and reviewed his claim for benefits. Continental informed Wolff that it needed additional information to assess his disability status. Specifically, Continental requested Medical Assessment Tool forms and medical records since October 2002 from Drs. Robert Craig, Hurley, and Danahey. (Pl. L.R. 56.1 ¶ 19.)

Dr. Hurley had faxed Wolff's medical records to Continental on December 26, 2002. Dr. Hurley also filled out a Medical Assessment Tool form diagnosing Wolff with "degenerative disc disease; C5-6 foraminal stenosis." Dr. Hurley estimated that Wolff could return to work in "approximately 6 months." (Def. L.R. 56.1 ¶ 12.)

The medical records forwarded by Dr. Hurley begin with a record of x-rays and an MRI of the lumbar spine performed on March 12, 2002 by Dr. Michael Mikhael. The MRI showed "degenerative disc disease at L5-S1 level, with a centrally small herniated disc, but no foraminal narrowing or compromise of the lateral recess. The remaining lumbar levels were normal. The alignment of the lumbar spine was normal. The distal spinal cord was normal. There is no evidence of bone destruction or bone erosion." (Admin. R., at 193.) The x-ray revealed "no evidence of subluxation, bone destruction or bone erosion in the lumbar region." (*Id.* at 194.)

Wolff had another x-ray of the lumbar spine on June 24, 2002, which resulted in an opinion of "negative study for significant bony stenosis or subluxation. There is no bone destruction or bone erosion." (Def. L.R. 56.1 ¶ 14.)

On July 2, 2002, Dr. Charles Wang ordered another MRI for Wolff. The MRI found "a small osteophyte along the ventral canal, slightly greater to the right of the midline. This is causing only mild stenosis of the canal. There is no significant foraminal stenosis. There is associated narrowing of the C5-C6 disc interspace." The MRI report also noted "minimal osteophytes" along the disc margins at other levels, but found "no focal disc herniations" and "no significant spinal or foraminal stenosis." At the other cervical disc interspaces, the report found "no significant bulging or herniated discs" and "no definite nerve root compression." (Admin. R. at 196.)

A report of another MRI performed on July 9, 2002 was also included in the records. This MRI revealed "degenerative disk disease and stenosis predominantly at the C5-6 level due to a combination of disc protrusion and small bony spurring" and "milder degree of degenerative disk disease with smaller disk bulges at the other cervical levels as described." (Def. L.R. 56.1 ¶ 16.)

An electrodiagnostic study including Nerve Conduction Studies and an EMG was performed by Dr. Wang on July 16, 2002. Dr. Wang reported, "Nerve conduction study was performed in bilateral median and ulnar nerves. The results were within normal limits. Needle EMG was also performed in the indicated muscles in bilateral upper extremities. The results were within normal limits." Dr. Wang reported his "impression" as "No clear-cut electrodiagnostic evidence of carpal tunnel syndrome or peripheral neuropathy or ventral radiculopathy." (Def. L.R. 56.1 ¶ 17.)

On November 26, 2002, Dr. Hurley diagnosed Wolff with "degenerative disc disease, disc bulge C5-6" and stating objective findings of "degenerative disc disease cervical spine C5-6

7

foraminal stenosis, myositis, L5-S1 herniated disc." (Admin. R., at 053.) A chart note from the November 26 examination indicated that Wolff "is making a decision with his work place to take a leave of absence to deal with his health problems. He has had low back pain and neck pain, and more recently gastroesophageal reflux and numerous psychosocial stressors." Dr. Hurley further noted that Wolff "wanted to hold off on injections at C6 on the right as had been suggested previously." (Def. L.R. 56.1 ¶ 18.)

On December 30, 2002, Wolff faxed Continental a summary of his treatment and some MRI reports not previously submitted to Continental. These included a report of an MRI performed on January 16, 2001 by neurologist Dr. Jonathan Alexander. The MRI indicated "Midline L5-S1 disk protrusion, without significant central stenosis. Disk material extends into both neural foramen with minimal inferior biforaminal narrowing." (Def. L.R. 56.1 ¶ 19.)

Continental received a Medical Assessment Tool from psychologist Dr. McNulty on January 6, 2003. Dr. McNulty diagnosed Wolff with "Anxiety D/O due to a General Medical Condition" with a secondary diagnosis of "L5 S1 Herniated disc, Acid Reflux, C5 C6 Herniated Disc." (Def. L.R. 56.1 ¶ 20.)

On January 9, 2003, Societe Generale Managing Director John Chauvel conducted a Physical Demands Analysis of Wolff's position as a Securitization Investment Banker. Chauvel concluded that this position required Wolff to work fifty to sixty hours per week, five days per week. The job required standing for half an hour and walking for half an hour at any one time, with a total of one hour standing and half an hour walking in a given workday. The job required sitting for three hours at a time with a total of up to seven hours sitting in one workday. Wolff was required to stoop, kneel, or crouch less than one third of the time. Chauvel did not indicate

8

that Wolff was required to do any lifting or carrying. (Admin. R., at 203-204.)

On January 15, 2003, Continental wrote to Wolff to advise him that his claim for benefits had been denied. (Def. L.R. 56.1 ¶ 22.) Continental informed Wolff that Continental would reconsider the decision if Wolff submitted additional medical information within 180 days, and it informed him of his appeal rights under ERISA. (Admin. R., at 184.) A physician did not review Wolff's initial claim. (Pl. L.R. 56.1 ¶ 20.)

On January 21, 2003, Continental received medical records from Dr. Danahey. Dr. Danahey, an otolaryngologist, diagnosed Wolff with "(1) Foreign body (2) Dysphagia" and "Reflux." (Admin. R., at 161.) Medical records submitted by Dr. Danahey indicate that Wolff had a CT Scan of his brain on July 11, 2002. The report of the CT Scan indicated, "There is right frontal soft tissue swelling. Otherwise, there is no abnormality. No evidence of inter-cranial hemorrhage." (Def. L.R. 56.1 ¶ 24.)

Wolff saw Dr. Danahey on August 7, 2002 complaining of a fish bone stuck in his throat and difficulty swallowing. Dr. Danahey's ENT examination was "entirely within normal limits. I was able to obtain a good fiberoptic examination and did not see any evidence of a fish bone empaled in any part of the oral cavity, propharynx or hypopharynx." Dr. Danahey's assessment was "possible foreign body in the pharyngeal tissue" and recommended a CT scan. (Admin. R., at 168.)  A CT scan performed that day indicated "Findings consistent with swelling from localized injury to the area of the aryepiglottic fold or vallecula on the right of the larynx. Findings are negative for demonstration of persistent foreign body." (*Id.*, at 172.) The following day, Dr. Danahey examined Wolff again and saw "no evidence of any foreign body or erythema" and assessed that the "foreign body passed on its own." (*Id.*, at 169.)

9

On October 23, 2002, Wolff visited Dr. Danahey again for "reflux laryngitis." Dr. Danahey reported that Wolff had "an episode about two weeks ago where he swallowed some food which got stuck in his throat and he felt like his wife almost needed to do the Heimlich maneuver but he was able to force it down. Since that time he has had some trouble swallowing." Dr. Danahey reported that Wolff's "laryngeal examination is normal. I do not see any swelling. There are no reflux changes." Dr. Danahey assessed dysphagia and stated that is was likely "related to the scary episode which occurred a couple of weeks ago. He is so concerned about this that I decided to do a modified Barium swallow to convince him that his swallowing is okay." Dr. Danahey "tried to reassure him that everything looked fine." (Admin. R. at 170.)

Wolff was seen at Northwestern University McGaw Medical Center on November 13, 2002, for a swallow evaluation. The report of the swallow evaluation indicated "a recent barium swallow reportedly showed normal results." The swallow evaluation report summarized the results stating that Wolff "exhibited a normal oropharyngeal swallow. He was advised to continue eating a general diet and to optimize his medications for reflux." (Admin. R., at 162.)

On November 25, 2002, Wolff followed up with Dr. Danahey claiming that "since he has been on the Nexium he has noticed an improvement in his condition." Dr. Danahey noted that Wolff "still has some mild interarytenoid pachydemia and a mild post cricoid edema." Dr. Danahey noted the negative results of the barium swallow evaluation and referred Wolff to Dr. Craig of the gastrointestinal department for an upper endoscopy

> to rule out any esophageal or stomach pathology. In addition he is seeing a counselor for some stress related issues at work. He has agreed to continue visiting with Dr. Craig, the counselor and myself in order to try to get the dysphagia under control so that he can

return to work. Accordingly, I have signed an off work release form for him to have several months off to recuperate.

(*Id,* at 171.) Dr. Danahey told Wolff that "if he needs an extension beyond March he would have to visit with his counselor because from an otolaryngology standpoint his problem should be resolved by then." (*Id.*)

Wolff underwent a normal upper endoscopy and gastric biopsy on December 2, 2002. Dr. Craig reported that the endoscopy was normal and gastric biopsy was negative. (*Id.* at 163-165.)

On January 24, 2003, Dr. Brenda Sikorski, Wolff's primary care physician, wrote to Continental advising that Wolff "has been under my care since January 7, 2003." Dr. Sikorski stated, "In my opinion, at this point in time, Mr. Wolff is unable physically and mentally to perform his job duties. I do not feel staying off work six months in unreasonable. It may be more acceptable for a three-month disability leave with a re-evaluation for a second three months at that time." (Def. L.R. 56.1 ¶ 31; PL. L.R. 56.1 ¶ 18.)

Wolff's wife, Laurie Wolff, wrote to Continental on February 13, 2002, submitting a formal appeal request and enclosing documents for review. Many of the documents were already in Continental's possession. Documents not previously provided included prescription slips for Clonazepan and instructions from Lee Memorial Health System regarding anxiety attacks and insomnia. (Def. L.R. 56.1 ¶ 32.)

On February 25, 2003, Continental wrote Wolff advising that it had reviewed the additional records from Dr. Danahey and Dr. Sikorski, but that the additional evidence did not change its opinion on denial of Wolff's benefit claims. Continental again advised Wolff of his right to appeal under ERISA. (Def. L.R. 56.1 ¶ 33.) A physician did not review Wolff's claim.

11

(Pl. L.R. 56.1 ¶ 22.)

On March 3, 2003, Wolff submitted an addendum to his Physical Demands Analysis,

signed by John Chauvel, listing the physical demands of his occupation as follows:

> Everyday lifting and carrying computer, documents and brief case to Chicago office
> weighing in excess of 20 pounds;
> Everyday walking greater than 5 blocks with computer, documents and brief case;
> Frequent lifting and carrying luggage, documents/presentations and computer weighing in
> excess of 50 pounds when traveling to New York office or to clients' offices in different
> cities;
> Frequent walking greater than 5 blocks with luggage, documents/presentations and
> computer when traveling;
> Everyday travel on trains, buses and taxis to Chicago office or when traveling, being
> subject to stops and jolts of vehicles;
> Everyday speaking in person or on phone for long periods;
> Picking up and carrying document binders, presentation books and legal files weighing in
> excess of 25 pounds from vault file cabinet to desk; and
> Using computer for drafting long documents, spreadsheets and presentations for periods
> of over 4 hours at a time.

The addendum also noted that Wolff job required "writing with substantial analytical reasoning

and making presentation books; creativity, persuasive and high energy interpersonal

communications; and multi-tasking on computer, phone, note taking and speaking." (Admin. R.,

at 202.)

On March 12, 2003, Wolff's attorney wrote Continental providing notice of Wolff's

intent to appeal Continental's decision to deny Wolff benefits, contending that Continental had

engaged in a selective review of the medical evidence and had failed to consider all of Wolff's

impairments in combination. (Pl. L.R. 56.1 ¶ 23.)

On March 17, 2003, Wolff's attorney provided Continental with additional records from

Wolff's psychiatrist, Dr. Robert Burton. Dr. Burton first evaluated Wolff on February 19, 2003.

Dr. Burton noted Wolff's mood was in an anxious and depressed mood, that he was goal directed

but had some scattered tangential thought processes. Dr. Burton's "diagnostic impression" was that Wolff suffered from anxiety disorder, and he wanted to rule out panic disorder. Dr. Burton recommended that Wolff's continue to take Clonazepan to treat his symptoms. (Def. L.R. 56.1 ¶ 37; Pl. L.R. 56.1 ¶ 52.)

On March 25, 2003, Continental wrote to Wolff's attorney advising that its decision remained the same and that it would forward Wolff's claim file to the Appeals Committee. (Def. L.R. 56.1 ¶ 38.) On April 17, 2003, Continental wrote to Wolff's attorney to advise that Continental was extending the time for appeal because it had "referred the file to a medical consultant for assessment of the file." (*Id.* ¶ 39.)

On April 9, 2002, Wolff formally appealed his claim through a letter citing and submitting additional evidence. The letter indicated that Wolff had received his record from Continental, which included a Claims Analysis Record, but no reports generated by a doctor, nurse, or vocational resource. Wolff's letter also claimed that Continental failed to evaluate the Physical Demand Analysis, improperly found Wolff capable of sedentary work, and improperly evaluated the medical evidence from Dr. Hurley, Dr. Burton, and Dr. Sikorski. (Pl. L.R. 56.1 ¶ 25.)

Dr. Scott Yarosh, a Diplomate of the American Board of Psychiatry and Neurology and a Diplomate of the American Board of Internal Medicine, reviewed Wolff's medical records and submitted a report to Continental on May 12, 2003. Dr. Yarosh reported his opinion as follows:

> Ultimately, his medical records have been essentially negative and he is left with an ongoing Anxiety Disorder with Panic. He is being treated with Clonazepan, but no other psychiatric medications.

> Mr. Wolff has a number of self-reported medical complaints, which he states precludes

him from carrying out his occupation as an Investment Banker. The clinical medical records do not substantiate that the self-reported complaints, in fact, have any associated abnormal physical findings with them, which would render Mr. Wolff disabled as he states. He does need to carry his files and computer, and pull drawers open which may weigh 35 to 50 pounds. However, it does not appear that he is required to do heavy lifting throughout the day nor does he have any clinical back or neck pathology which would make it unsafe for him to perform his job.

(Def. L.R. 56.1 ¶ 40.) Dr. Yarosh further stated that there

do not appear to be any necessary restrictions. There is nothing that would indicate that he couldn't carry his computer or open drawers, even if they do weigh 35 to 50 pounds. There is no reason why he cannot engage in ongoing travel. The fact that he has been advised to stay off work until 6/03 does not appear to be based on any scientific clinical evidence which would substantiate a specific illness that would be disabling. I therefore think that work restrictions are unnecessary and that Mr. Wolff ought to be able to return to work as of now with no restrictions.

(*Id.*) Dr. Yarosh identified the medical records he reviewed to complete his report. He did not indicate that he had reviewed Dr. Hurley's reports. (Pl. L.R. 56.1 ¶ 28.)

On May 14, 2003, the Appeals Committee wrote to Wolff's attorney advising that it had upheld the decision to deny benefits. The Appeals Committee enclosed a copy of Dr. Yarosh's medical assessment for review. The Appeals Committee further advised, "Your client has exhausted all administrative remedies offered by the appeals process. This decision is final and binding." (Def. L.R. 56.1 ¶ 41.)

On May 19, 2003, Wolff's attorney wrote to Continental enclosing notes from Dr. Sandeep Aggarwal. Dr. Aggarwal examined Wolff on April 30, 2003. Dr. Aggarwal noted Wolff's "range of motion of the neck is limited." Dr. Aggarwal's examination and Wolff's description of his symptoms were "indicative of cervicalguia with sensory radicular symptoms that may be related to his MRI findings. Upon personal review, there is evidence of disc bulging at C5-C6 and C6-C7. Additionally, the underlying mood disturbance may be contributory."

(Admin. R., at 068.) Dr. Aggarwal prescribed Elavil, an antidepressant. (Pl. L.R. 56.1 ¶ 44.)

## DISCUSSION

1. *Standard of Review*

Section 1132(a)(1)(B) of ERISA empowers courts to review the eligibility decisions of employee benefit plan administrators. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co.* v. *Bruch*, 489 U.S. 101, 115 (1989). If a plan gives an administrator discretionary authority, the appropriate judicial review is the arbitrary and capricious standard. *Mers* v. *Marriott Int'l Group*, 144 F.3d 1014, 1019 (7th Cir. 1997). For the administrator to wield such discretionary power to deny claims, "the employees should be told about this, and told clearly." *Herzberger* v. *Standard Ins. Co.*, 205 F.3d 327, 333 (7th Cir. 2000) (formulating safe harbor for employers: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them."). If the arbitrary and capricious standard is applied, then the decision of the administrator will be left undisturbed so long as the administrator "makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts . . . ." *Loyola Univ. of Chicago* v. *Humana Ins. Co.*, 996 F.2d 895, 898 (7th Cir. 1993).

Here, neither the short-term nor the long-term plan contains language indicating that CNA has discretionary authority to determine a plan beneficiary's eligibility for benefits. Indeed, both are silent on discretion, thereby invoking the default rule of *de novo* review. However, the SPD and the Certificate of Insurance for the long-term plan clearly state that Continental has

discretionary authority determine eligibility for benefits. Continental argues that such language in the SPD and Certificate of Insurance for the long-term plan was sufficient to notify Wolff of Continental's discretionary authority, thus invoking an arbitrary and capricious standard of review in this case. The court disagrees.

Continental argues first that the Certificate of Insurance for the long-term plan "has been incorporated into the policy," because it was included at page 6 of the long-term plan. (Def. Mot. for Summ. J., at 15.) However, the Certificate itself clearly states that it "is not the policy. It is merely evidence of insurance provided under the policy." This language directly undercuts Continental's claim that the Certificate was "incorporated" into the plan.

Continental next argues that the plans themselves need not confer discretion, so long as "plan documents" do so, *citing Herzberger*, 205 F.3d at 330 (*de novo* standard is "to govern when the plan documents contain no indication of the scope of judicial review."). While *Herzberger* does use the words "plan documents," the court was not addressing the issue of where language granting discretionary authority to a plan administrator must appear, but rather what language is sufficient to clearly inform plan beneficiaries of such discretionary authority. *See id.* at 331 (formulating the safe harbor language). In fact, the *Herzberger* opinion uses the words "plan documents"and "plan" interchangeably. *See id.* at 331 ("An ERISA plan that contains such language will not be open to being characterized as entitling the applicant for benefits to plenary judicial review of a decision turning him down." "In other[] [cases] the plan will contain language that, while not so clear as our 'safe harbor' proposal, indicates with the requisite if minimum clarity that a discretionary determination is envisaged."). *Herzberger* simply does not address the issue for which Continental draws on it to support.

The central issue, then, is whether an SPD or Certificate of Insurance can grant

discretionary authority to a plan administrator where the plan itself is silent. It is clear that when

there is a conflict between a plan and an SPD, the terms of the plan govern, unless the participant

detrimentally relied on the terms of the SPD. *Health Cost Controls of Illinois, Inc.* v.

*Washington*, 187 F.3d 703, 711 (7th Cir. 1999). Continental argues, however, the plan does not

conflict with the SPD. In support of this argument, Continental relies on *Gaspar* v. *Linvatec*

*Corp.*, 952 F. Supp. 1274 (N.D. Ill. 1997). In that case, plaintiffs sued to recover benefits under

both a basic severance plan and a voluntary retirement plan ("VRP"). Neither plan stated that an

employee could not be eligible for benefits under both plans. However, the SPD for the VRP

stated in bold type, "Severance benefits do not apply if you elect VRP." *Id.* at 1276. Plaintiffs

argued that where a SPD favors an employer, the plan language controls. *Id.* at 1279.

The court held found that silence in the VRP did not conflict with an affirmative

statement in a SPD:

> The flaw in plaintiffs' argument is that the cases from which they cull their proposition
> involve actual conflicts between a plan and the plan's summary plan description . . . . In
> these types of cases, the courts have held that the plan language controls, particularly
> where the summary plan description contains a provision explicitly stating that the plan
> language takes precedence over summary plan description language in the event of a
> conflict between the two, and where the plan is more favorable to the employee than the
> summary plan description. . . . In the present case, however, the VRP is silent about its
> relationship with the severance plan. In contrast, the VRP summary plan description
> explains that an employee cannot receive both VRP and severance benefits. Thus, no
> conflict exists between the summary plan description and the VRP itself.

*Id.* at 1280.

The facts of *Gaspar* are distinguishable from those in the instant case. First, the parties in

*Gaspar* agreed the plans gave the plan administrator discretionary authority to interpret and

17

construe provisions of the plan and resolve inconsistencies and omissions in the plan. *Id.* at 1278. Thus, the court reviewed the plan administrator's decision under an arbitrary and capricious standard. *Id.* As the court stated, "the summary plan description can 'be used to fill the interpretive gap,' *particularly considering that the court is 'reviewing the [plan administrator's] interpretation under a deferential standard.*" *Id.* at 1280 (emphasis added.). However, in the instant case, the standard of review is exactly what is at issue. The court need not defer to Continental's argument that the court should employ a deferential standard of review.

Second, the SPD's in the instant case explicitly state that they "do[] not constitute a part of the Plan, nor any insurance policy issued in connection with it." (Admin. R., at 023, 046.) The SPD at issue in *Gaspar* contained no such language. In its absence, the *Gaspar* court had no trouble using language from the SPD to "fill an interpretative gap." 952 F. Supp. at 1280. To do the same in this case would be to make language from the SPD "a part of the Plan," which the SPD clearly disallows.

Numerous courts have held that discretionary language contained in an SPD is insufficient to merit deferential review where the plan itself is silent or the language used in the plan fails to satisfy the *Herzberger* test. *See Billings* v. *Continental Casualty Co.*, 2002 WL 145420 (N.D. Ill. Jan. 21, 2003); *Flood* v. *Long Term Disability Plan for First Data Corp.*, 2002 WL 31155099 (N.D. Ill Sept. 27, 2002); *Akhtar* v. *Continental Casualty Co.*, 2002 WL 500544 (N.D. Ill Apr. 1, 2002); *Reinertsen* v. *The Paul Revere Life Insurance Co.*, 127 F. Supp.2d 1021 (N.D. Ill. 2001); *Clark* v. *Bank of New York*, 801 F. Supp. 1182 (S.D.N.Y. 1992). Perhaps the best explanation for this holding appears in Judge Kocoras' opinion in *Akhtar*:

The language of the plan is what controls; a summary plan description cannot be used to

18

expand discretion given under [a] plan. *See, e.g., Health Cost Controls of Illinois, Inc.* v. *Washington,* 187 F.3d 703, 711 (7th Cir. 1999). In this case, CNA argues that the language of the plan, requiring "due written proof" of a loss, when read in conjunction with the language of the summary plan description, confer the discretion needed to justify an arbitrary and capricious standard of review. However, in light of applicable Seventh Circuit case law, we cannot read these two documents in conjunction. There is no substantive difference between the "due written proof" required by CNA's plan and the "satisfactory written proof" that was held insufficient to grant discretion in *Health Cost Controls.* In addition, the language of the summary plan description states that the information it contains is not part of the policy itself. The language of these two documents is therefore in conflict. Because the language of the two documents conflict, the SPD cannot be considered to supply the discretion that is not found in the language of the plan. We therefore review CNA's decision *de novo.*

2002 WL 500544, at *4. The court finds this reasoning persuasive.

In *Bolden* v. *Unum Life Insurance Co. of America,* 2003 WL 921764 (N.D. Ill. Mar. 6, 2003), the court came to the same conclusion when the language granting discretionary authority to determine eligibility for benefits appeared in a Certificate of Insurance but not in the plan itself.[3] Though the *Bolden* court gave only a brief explanation for its decision, Judge Kocoras' reasoning in *Akhtar* applies with equal force whether the discretionary language appears in an SPD or a Certificate of Insurance. Thus, the court will review Continental denial of benefits to Wolff *de novo.*

## 2. Merits

Under a *de novo* standard of review, the court must look beyond whether Continental's decision to deny benefits to Wolff was reasonable and determine whether it was correct. *Postma* v. *Paul Revere Life Ins. Co.,* 223 F.3d 533, 540 (7th Cir. 2000). The objective medical findings

---

[3]Continental argues that *Bolden* is not valid precedent because Seventh Circuit Rule 53(b)(2)(iv) prohibits the use of unpublished opinions as precedent "(a) . . . in any federal court within the circuit in any written document or in oral argument; or (b) by any such court for any purpose." (Def. Reply at 3.) This rule only applies to Seventh Circuit opinions. *Bolden* is not a Seventh Circuit opinion.

concerning Wolff's back condition included an MRI of the lumbar spine on January 16, 2001,

which indicated a "midline L5-S1 disk protrusion without significant central stenosis.[4] Disk

material extends into both neural foramen with minimal significant biforaminal narrowing."

(Admin. R., at 209.) An MRI of the lumbar spine performed March 12, 2002 revealed

"degenerative disc disease at the L5-S1 level with a centrally small herniated disc but no

foraminal narrowing or compromise to the lateral recess. The remaining lumbar levels were

normal. The alignment of the lumbar spine was normal. The distal spinal cord was normal.

There is no evidence of bone destruction or bone erosion." (*Id.* at 193.) An x-ray performed that

day was a "negative study showing no evidence of subluxation, bone destruction or bone erosion

in the lumbar region." (*Id.* at 194.) Another x-ray performed in June of that year indicated a

"negative study for significant bony stenosis or subluxation. There is no bone destruction or

bone erosion." (*Id.* at 195.)

An MRI of the cervical spine performed July 2, 2002 demonstrated "Degenerative

changes are noted in the cervical region . . . most pronounced at the C5-C6 level where there is a

small osteophyte along the ventral canal, greater to the right of the midline, with mild narrowing

of the canal. There is no definite nerve root compression." (Admin. R., at 196.) A follow-up

MRI performed July 9, 2002 showed "Degenerative disc disease and stenosis predominantly at

the C5-6 level due to a combination of disc protrusion and small bony spurring" and a "Milder

degree of degenerative disc disease with small disk bulges at the other cervical levels . . . ." (*Id.*

at 208.) An EMG and nerve conduction study performed later in the month were "within normal

limits" with "no clear-cut electrodiagnostic evidence of carpal tunnel syndrome or peripheral

---

[4]Stenosis is a stricture of any canal or orifice; a narrowing. (Pl. L.R. 56.1 ¶ 41 n. 11.)

neuropathy or ventral radiculopathy." (*Id.* at 192.) In addition, Dr. McNulty diagnosed Wolff

with an anxiety disorder, and Dr. Danahey diagnosed Wolff with dysphagia and acid reflux. (*Id.*

at 055-057.)

These "objective medical findings" indicate that Wolff had degenerative disc disease and

stenosis at the C5-C6 level, a small herniated disc, and a small Osteophyte, acid reflux and

dysphagia, and, perhaps as a result of these physical maladies, anxiety disorder. The key issue

for the court, however, is not whether Wolff actually had these disorders, but whether these

disorders were so severe that Wolff is "continuously unable to perform the Material and

Substantial Duties" of his occupation as a securitization investment banker. *See Akhtar*, 2002

WL 500544, at *5. Dr. Yarosh reviewed the records in Wolff's claim file and determined,

> his medical records have been essentially negative and he is left with an ongoing Anxiety
> Disorder with Panic. . . . Mr. Wolff has a number of self-reported medical complaints,
> which he states precludes him from carrying out his occupation as an Investment Banker.
> The clinical medical records do not substantiate that the self-reported complaints, in fact,
> have any associated abnormal physical findings with them, which would render Mr.
> Wolff disabled as he states. . . . There is nothing that would indicate that he couldn't carry
> his computer or open drawers, even if they do weigh 35 to 50 pounds. There is no reason
> why he cannot engage in ongoing travel.

(Def. L.R. 56.1 ¶ 40.) On the other hand, Dr. Sikorski, who apparently reviewed the same set of

records, determined, "In my opinion, at this point in time, Mr. Wolff is unable physically and

mentally to perform his job duties. I do not feel staying off work six months in unreasonable."

(Def. L.R. 56.1 ¶ 31; PL. L.R. 56.1 ¶ 18.)

Wolff attempts to discredit or minimize Dr. Yarosh's opinion by suggesting that his

opinion is "tainted" because he was employed by Continental. (Pl. Reply, at 7, citing *Black and*

*Decker Disability Plan* v. *Nord*, 538 U.S. 822 (2003)). Continental attacks Dr. Sikorski's

statement by stating that she "never submitted any medical records to verify that opinion" and that she "does not definitively state Plaintiff must stay off work due to his medical condition, only that it would not be unreasonable to do so." (Def. Resp., at 12.) Such attacks are out of place at the summary judgment stage. The court will not weigh conflicting evidence or make credibility determinations on a motion for summary judgment. The parties directly dispute the central material fact in this case, and both parties can point to evidence in the record to support their respective positions. The court is not institutionally competent, even on *de novo* review, to determine independently if Wolff's condition was so severe that he could not perform the duties of his occupation. This is an issue of material fact properly determined by a trier of fact. Thus, both parties' motions for summary judgment must be denied, and the case will proceed to trial.

## CONCLUSION

For the reasons stated above, both parties' motions for summary judgment are denied [#8, # 10]. This matter is set for a status hearing on October 19, 2004 at 9:30 a.m. In the meantime, the parties are directed to meet in a sincere effort to resolve this case before trial.


Dated: September 28, 2004                    ENTER: *Joan H. Jefkow*
                                             JOAN HUMPHREY LEFKOW
                                             United States District Judge